Good morning. May it please the court, there are three items I'd like to address this morning, although I'm sure the court may have its own opinion on what to discuss as well. The first is on the simple facts of this case, which were decided by the board below incorrectly. There is no correlation between paddle testing and basket testing associated with the record here. The only evidence was taken from... But you didn't claim it in terms of what test and the results of a test, you claimed it as a controlled release compound, and Maloney even recites oxymorphone in its list of the compounds that would respond to its particular way of doing things, which whether it's a basket method of measurement or a paddle method of measurement, it's still controlled release, which is what you claim. Well, with respect, Your Honor, the claims do specify that the USP paddle method has to be used. That's recited in both of the independent claims that are at issue here. The Maloney reference uses a different... Wouldn't one of skill in the art understand that you can correlate the paddle method to the basket method? No, Your Honor, they would not. The record evidence is that Dr. Chang put in a declaration saying there is no correlation. He attached to his declaration two articles that say there is no correlation. They talk about possibly creating a correlation based upon whether a soft tablet or a hard tablet, but they say that they do not identify any correlation based upon the two testing methodologies. The only correlation that's in this record at all... But the board looked at that and found that there was actually, looking at the evidence you get from both methods, somewhat of a correlation. Now, what the board below did was it took the data submitted by Dr. Chang, not data from the prior art, data submitted by a declarant during the course of prosecution and created a Maloney and compare it to other time points. The board used the one hour time point. If you look at the data at other time points that's in Maloney and the data that's in the KO application, and we put a chart of that on page 25 of our brief, the data falls apart. And in fact, the director's brief admits that that correlation only works at one hour. So now we have a correlation that appears to work at one hour and is only based upon testing one particular type of compound. Well, isn't one hour the only correlation we need to know about because that's the exact subject of the claim. The claim says at the one hour point. Judge Wirt, claim one is directed to one hour. The only claim before us, given the expedited nature of this. Well, claim 20 was also identified as a separate and independent claim. There are no independent arguments any place in the prosecution with regard to claim 20. You only references point to the fact that people say claim one and 20 are rejected or claim one and 20 should be allowed. But there are no, not a single sentence of independent argument that distinguishes from your perspective, claim one and claim 20. And the reason for that, your honor, is that until the board made its finding, no one had asserted that there was a mathematical correlation that would bring up that difference. It was the board's creation of this 1.3, not something argued by the examiner, was the board's creation of the 1.3 that made that the most relevant. Well, you say not something argued by the examiner, but the examiner was pointing to Maloney only, which discloses the basket method and saying it rendered obvious your paddle method claims. So clearly this was an issue at every stage of the prosecution process. The correlation between basket and paddle was, it was the board, however, that created the 1.3 factor to do that association. And that's when it becomes most clear that you can look at claim 20 and see that the data does not line up using the 1.3 multiplier. But you still got Maloney reciting oxymorphone. We're talking about the same characteristic, controlled release. Are we really getting very far by arguing a difference in measurement methods when the record shows at least some evidence that there's even a correlation there? Well, I agree with you, your honor, that Maloney does recite oxymorphone, and I'll even go as far to agree that it recites oxymorphone in the shorter list of compounds as well that might be of interest to it. But the fact of the matter is, and the board discounted this entirely, the fact of the matter is that Dr. Fisk set forward in his declaration there would be no expectation that oxymorphone could function in a controlled release environment. Now, Maloney recited oxymorphone among a list of opiates, opiates that were known in the art in instant release. All of Maloney's work was on a different opiate, oxycodone. But the Maloney reference went further, didn't it? Didn't it say that oxymorphone would be, quote, useful in the present invention? It was one of the compounds in that shorter list that it said would be useful in the instant invention. Yes, your honor. But Judge Moore, it can't just recite it if it goes contrary to what people of skill in the art would understand. And the Fisk declaration, unrebutted, establishes that based upon the bioavailability differences between oxymorphone and oxycodone, oxycodone is bioavailable at about 60% orally. Oxymorphone is about 10% orally. And the Fisk declaration shows that one of skill in the art, looking at these two compounds, would not substitute one for the other in a controlled release system because the liver will chew it up. The expectation is that it would never make it into the bloodstream to be analgesically effective, which is required by the client. So in terms of the obviousness analysis, and this is an obviousness case, this is not an anticipation case. In an obviousness analysis, we have to ask the question, what would one of ordinary skill in the art understand at the time the invention was made? At the time the invention was made, the Chang comparison of paddle and basket did not exist. At the time the invention is made, the understanding was that the bioavailability of oxymorphone would mean that you would not use it in a controlled release environment because it would never work for analgesia. And so there is no establishment of this likelihood of success. There is no reason why one of skill in the art would use oxymorphone in controlled release, notwithstanding the statements in Maloney that it would be a nice result to get, that it would be a product that would be considered would be to use oxymorphone in a controlled release. Mr. Lewis, assume that we're not persuaded and that we find that a prima facie case has been established by the patent office. What's your reaction to the way the board treated the secondary evidence? I think the board erred as a matter of law in its handling of the secondary evidence. Is it your position that the secondary evidence was considered or was not considered at all? It seems that it was not considered at all, Your Honor. Judge Lynn, it looks like they took the secondary evidence and simply said, no, you've only submitted information about one embodiment and one embodiment is not the claimed invention and therefore we're going to ignore it. And there are basically two grounds of secondary considerations that were argued. Then for the unexpected results, don't they have a pretty good point? You've dealt with one formulation. There's some evidence in the record that you might have a variance depending upon the different formulations and you've claimed much more broadly than you've shown unexpected results. Isn't there a nexus problem there? Your Honor, the cases allow a factual inquiry into whether or not the nexus is appropriately established for the unexpected results component. I think the factual submission by Dr. Yeomans shows unexpected results, but the cases allow the board below to have some analysis on whether or not it is appropriately shown to be a nexus. But on the commercial success component, which is the second component of secondary considerations, on the commercial success, one example is enough. This court, just last week, in the In re Glant case, which we submitted a supplemental citation of authority on, made quite clear that one example, one commercialization, is quite sufficient and you can't expect someone to commercialize multiple embodiments as competitors against themselves. But when only one example is provided, doesn't there have to be something in the record to suggest or to believe that that example is representative of all examples within the scope of the claim? We have a declarant, again Dr. Chang, who made clear that this did practice the patented invention. And we have a declarant, Ms. Wysensky, who set out a large number of factors, everything from sales to recognition by those in the industry who set reimbursement tiers, to the way in which the product was accepted by pain care physicians, a very narrow class of physicians who frankly are quite discriminating, according to the declaration, on what they will prescribe. The claim covers the composition with oxymorphone and any number of excipients, so what is there in the record that would suggest that the one composition with oxymorphone and the one excipient would be representative of all of those compositions? The product that's developed, and this is in the record, is example four. And example four is described as being typical of the claims that are, of the compounds that are covered by the claims. The record is that Dr. Chang's second declaration identifies this as being a representative product. That's unrebutted. There has been no questioning of that. Well, it's just a conclusory statement. What is there in the record that suggests that the choice of excipient wouldn't make any difference here in terms of the unexpected results or the commercial success? The data submitted for the IR, the instant release, and for the extended release versions indicate that there is a clear, clearly demonstrate that this is representative of the scope of the claims. And there is an affidavit from Dr. Yeomans, which in the appendix, page 787, 788, he talks about different investigations conducted with different types of active ingredients. Which could be argued to suggest that, well, it's not the excipient that makes a difference, because after all, the beneficial effects were not observed with all these different active ingredients using essentially the same excipient. So it can't be the excipient. Or it certainly can't be the excipient alone. Is that an argument you're making? The Yeomans declaration, which of course goes to the unexpected results point more than the commercial success point, but both under the secondary considerations umbrella, and I do know I'm in my rebuttal time, but I want to address your question. It does indicate that there are some uniquenesses to the oxymorphone molecule. But more particularly, it also shows that those uniquenesses only come out in oxymorphone-controlled release, which is the subject matter of the claim with some gloss on it in terms of the results of the various dissolution testing. Because the dissolution testing is what shows one of skill in the art how to make an efficacious compound that will work for 12-hour dosing, also required by the claim. And so this is a representative example of the scope of the claims. Thank you, Mr. Lewis. Want to save the rest of your time? Yes, please. Ms. Lynch? May it please the court. It was well known in the art to use opioids to treat pain. It was also well known to make controlled release opioids. But was it well known that there existed a correlation between the paddle and the basket method? There's definitely been testing on both the paddle and the basket. What testing? Are you talking about Dr. Chang's tests? Dr. Chang and in the prior art. But the PTO didn't cite any prior art, and there's no statement anywhere that I could find from the examiner or otherwise saying one of skill in the art would know if you have something that dissolves between 15 and 50 percent at the paddle method, and then it dissolves at 10 percent at the basket method, that those two things would be within the same range or something like that. There's nothing, I couldn't find any citations in the record from the office that would offer its explanation for why those things were known to correlate. So what happened during prosecution, as you said, the claim is very broad. It's 15 to 50 percent at one hour. So during prosecution, the examiner found the Maloney reference, and this is on A3 of the board's opinion, and he says that Maloney, the controlled release delivery system described by Maloney reads on the claim as well as the described systems. All of Maloney's formulations fell within that 15 to 50 percent. Then it went to Cow to try and rebut that, and it was up to Cow to try and say, well, the basket method is different than the paddle, or substituting oxymorphone would change it. And Cow didn't try to rebut at all that substituting oxymorphone for oxycodone in Maloney's formulations would change it in any way, but he did try to rebut that the basket and the paddle were comparable. I don't understand the initial premise. Why is the examiner entitled to say that something that discloses 5 to 25 percent according to the basket method is equivalent to something that discloses 15 to 50 percent of the paddle method? I don't understand as an initial premise why the examiner is allowed, why you say there's even a prima facie case when you've got two entirely different methods for dissolving the tablet. Well, let me explain. They're not entirely different. They're both done in a vessel. In the paddle method, you put the tablet at the bottom. There's a paddle. I think we understand. Okay, and the basket is in a basket on the shaft, and so that circulates. So, both of the methods are very similar. The PTO doesn't have testing capabilities, and it's a reasonable assumption since the claim was so broad in all of Maloney's formulations. But Maloney's point was what, 25 percent, correct? For Formula 6, it was 24.3 percent. 24.3 percent at the one-hour point, and the claim says 15 to 50 percent. Right, so the examiner said this falls within it. If you want to try and rebut, you let us know. So, they tried to rebut. But doesn't the examiner, isn't the examiner under some obligation to come up with some piece of evidence to support that conclusion? You can't just say, well, black is white. Now, go prove otherwise. Well, there's nothing in the record that says that they wouldn't be the same for this drug. There's a patent office burden to establish a prima facie rejection. It is their burden, and they said, here is a dissolution rate that falls within it. But didn't they come up with the Fisk declaration that says oxycodone, as shown in Maloney, has a very different bioavailability rate from oxymorphone? Suggesting one of skill in the art wouldn't correlate them. But that's different. The bioavailability is different. The dissolution rate, Cow does not argue that dissolution, which is done in vitro, would be different for oxymorphone and oxycodone. They never say that. So, when Cow tried to rebut, what he did is he said, basket is usually faster. He said there's no generally accepted correlation. I feel like the office has some obligation to say, one of skill in the art would know this. That there's a correlation between the two, or point to a reference which demonstrates a correlation. I mean, if I say I'm going to take your temperature by putting a thermometer in your mouth versus under your arm, I mean, maybe a doctor would say, well, look, those temperatures are going to correlate. They might not be exactly the same, but they're going to correlate. Are they going to correlate enough to put the 24.3% within the 15% to 50% range? I don't know, but I feel like we need some piece of evidence that says that. I think, like I said, the PTO doesn't have testing capabilities. It was a very broad range. It fell well within it. I think it was reasonable for the PTO. It didn't fall within it because it wasn't the same measurement. You were measuring one using basket and one using paddle. You can't say, oh, well, you're at 23 kilograms, therefore you fall within the 15 to 40 pounds range. I mean, it's two totally different measurements. But there's nothing to say that they wouldn't have been the same. And they turned out to be almost the same. That's the PTO's burden. You have the burden of proof. There's nothing to say they wouldn't be the same. They're two different tests. They are different tests, but they're very, very similar. It was a broad range. It fell well within it. And Cal tried to rebut. And when he tried to rebut, what he showed was that for this particular drug, even using his correction factor of 1.3, Melani still fell within the range. You can't rely on Chang for your prima facie case. I think the office acknowledges that, right? That's correct, Your Honor. And they didn't. They made what we think is a reasonable assumption that the two were comparable. And when they tried to rebut, they showed a little bit of a difference, but it still fell within the range. So I'd like to talk a little bit about the commensurate and scope, if I could. So Judge Lynn mentioned in the case law, both Greenfield and Sescon say that you need to show that if you're only going to pick one embodiment, that it needs to be representative. This is the pharmaceutical field. You're only going to go through FDA clearance for one product. So there's only going to be one product with commercial success. You're going to ask them to show commercial success far beyond that? No, Your Honor. And I want to go back to the observations made by this court in Glatt where they said, you know, you don't have to test every conceivable embodiment for commercial success. And it's not the PTO's position that you do always have to test every conceivable embodiment. But I don't think the opposite is true. I don't think one embodiment is always enough. I think it depends on the circumstances. You have to look at how broad the claim is. Is it possible the commensurate and scope language then is maybe just not the best set of words to enunciate the principle that you're trying to convey? I mean, the PTO is using this commensurate and scope suggesting, just as Judge Rader points out, that you've got to prove commercial success of every embodiment. No, that's not our position. Our position, though, is in this case there was a factual finding that there was a difference. And in that case, they had to show that there wouldn't have been a difference between these. And they did not make that showing. Dr. Yeomans in his declaration- Wait a second. You say there was a factual showing that there was a difference. What factual showing are you talking about? Well- Is the difference- are you talking about the difference between the immediate relief drug and the extended relief drug? So there were three- Is that the comparison? Right. But why is that relevant when we're talking about whether the excipient of the test in the composition of an extended relief drug is representative of all excipients in a composition of that sort? So- You've got to compare the right things, do you not? So by comparing the controlled release to the immediate release, we know it's not the oxymorphone itself. We know it's something in the formulation. Well, that's right. So it's the formulation. Right. It's the composition comprised of the active ingredient, the oxymorphone, and the excipient. And so we know it's something in the formulation. It's not the oxymorphone itself. But we don't know whether it would be in all controlled release formulations. Well, you say it's not the oxymorphone itself. Maybe there's something in the oxymorphone. And I think Cal is arguing that, yes, the characteristics of the oxymorphone, when used in extended relief composition, produce an unexpected result. So it's not necessarily any particular characteristic of the excipient, but it's the result of the composition. So you're saying it's the combination of the active ingredient in that formulation? That's right. So the question, I think, that has to be addressed is, what is there in the record that would cause one to believe that this one particular excipient in the composition is representative of the body of compositions that are encompassed in the claim? So Dr. Yeomans never says in his declaration that he would expect all controlled release formulations with oxymorphone to act the same. He never makes that showing. So it was reasonable for the board to say, well, the immediate release doesn't have it. This one, one controlled release has it. But there's nothing that tells me that all the other controlled release formulations within this claim would have it. Well, maybe if that's what the board said, we'd have a different case. But that's not what the board said. The board said, well, if you compare this composition with the immediate release drug, well, it's obvious that the difference must be due to the excipient. And therefore, since the evidence of secondary considerations is just one example, it doesn't count. But I think that's consistent. And Dr. Yeomans never rebuts that. He never says anything different. He never says, well, if you used an osmotic pump instead of this polymer matrix, I would expect it to act the same. They never make that showing. So I think, I think the board showing is a reasonable assumption by the board and should be affirmed. And they don't put forth anything contrary. The court has nothing further. Thank you, Ms. Lynch. Mr. Lewis, could I claim aspirin if I found a new test for blocking prostaglandins and claimed it in terms of that test? I can just invent a new test for blocking prostaglandins, and so I'm going to claim aspirin now and get coverage for that. Can I do that? I suspect, based upon my knowledge of the use of aspirin, you'd be hard-pressed if there was prior art that was up against you that showed all of the elements of your claim. But if you found a new way to use aspirin for prostaglandin control and it wasn't in the prior art, you might very well be able to get that. Why isn't this in the prior art, though? The PTO points out that both of these tests are just testing, they're testing the same thing, dissolution in vitro. And they're testing it, and they even showed that there seems to be a correlation. So I'm having trouble finding out what you have invented other than a new test. The Chang Declaration says they're not correlative in the prior art. And the two articles it submitted, and I would specifically refer to the court to the conclusions at A1554 and A1562, say just the opposite, Your Honor. They say that there is no correlation. Just the overall variability of the USP dissolution test can be reduced, and the rate of extended tabulous dissolution improved by performing the task using the USP basket apparatus in place of the paddle apparatus, and it goes on. There is no correlation. This is not aspirin for prostaglandin. This is a new concept of how to get an oxymorphone-controlled release product that's going to perform in a way that will give 12 hours of analgesia, also not in Maloney. There's a failure here of the board to identify these facts. There are not fact findings. You look at cases like Thrift, cases like Sang Soo Lee. The board is required to make those fact findings. They have not. And by failing to do so, Your Honor, we believe there was error of law, and this case ought to be reversed. Okay. Mr. Lewis, we're going to have probably a chance to talk about some of this again. Why don't we go to the next case, though?